## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CORPORATE AMERICA CAR WASH SYSTEM, et al.,** } <br> } <br> } <br> **Plaintiffs,** } <br> } <br> **v.** } <br> } <br> **CITY OF BIRMINGHAM, et al.,** } <br> } <br> **Defendants.** } | **Case No.:  2:14-cv-781-RDP** |
| **CORPORATE AMERICA CAR WASH SYSTEM, et al.,** } <br> } <br> } <br> **Plaintiffs,** } <br> } <br> } <br> **v.** } <br> } <br> **THE BIRMINGHAM PARKING AUTHORITY, et al.,** } <br> } <br> **Defendants.** } | **Case No.:  2:14-cv-866-RDP** |

## MEMORANDUM OPINION

This case is before the court on Defendants'[1] Motion for Summary Judgment.  (Case No 2:14-cv-00781-RDP Doc. # 38; Case No 2:14-cv-00866-RDP Doc. #54).  Plaintiff has had an opportunity to respond to the Motion and submit evidence, and Defendants have replied.  (Case No 2:14-cv-00781-RDP Docs. # 45, 46 and 49; Case No 2:14-cv-00866-RDP Docs. 63, 64 and 68).

---

[1] The moving Defendants are Wanda Knight, Kevin Owens, the Birmingham Parking Authority, the Birmingham Parking Authority Board Members, Lynn Thomas, and Larry Warde.  (Case No 2:14-cv-00866-RDP Doc. #54).  However, this court's memorandum opinion is equally applicable to the claims asserted against Defendants the City of Birmingham, Mayor William Bell, Jarvis Patton, and Don Lupo.  (Case No 2:14-cv-00781-RDP Docs. # 1, 38 and 39).

I.      **Summary of Relevant Facts**[2]

The Birmingham Parking Authority was created by an act of the Alabama Legislature to manage off street parking for the City of Birmingham.   The BPA currently manages eight parking decks and one parking lot, all of which are owned by the City.   Kevin Owens and Larry Ward are members of the Board of Directors of the BPA. Lynn Thomas is the Executive Director of the BPA, and Wanda Knight is her Executive Assistant.

A.      **The Agreement**

On November 16, 2012, Plaintiff Michael Williams, doing business as Corporate America Car Wash, and the BPA entered into an Agreement for Corporate America Car Wash to Provide Services to Customers of The Birmingham Parking Authority.   (Doc. # 39-1).   No money was exchanged between Plaintiff and the BPA in connection with the Agreement.  (Doc. # 39-2).   The Agreement was designed to memorialize that Plaintiff would be allowed to clean vehicles of his customers who parked in decks managed by the BPA and the terms under which he would be allowed to do so.  (Doc. # 39-2).

The Agreement included the following provisions:

> 1.      Corporate America Car Wash (CACW) shall abide by all rules posted in City Parking Decks.
>
> …

---

[2] If facts are in dispute, they are stated in the manner most favorable to the non-movant, and all reasonable doubts about the facts have been resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only.   They may not be the actual facts that could be established through live testimony at trial.  *See Cox. v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Asserted "facts" that are not facts at all will be disregarded.   *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value).   Conclusory allegations of this type will be disregarded for summary judgment purposes.

     3.     This agreement may be terminated for breach of the terms provided herein. The Authority reserves the right to evaluate the continuation of services under this agreement and establish additional terms as required by the Board of Directors.

(Doc. # 39-1).

The Agreement did not authorize Plaintiff to store any equipment in BPA's parking decks, nor did it allow Plaintiff to advertise in the decks, or harass or intimidate members of the BPA staff or employees of local businesses. (Doc. # 39-2).

The Rules and Regulations of the Birmingham Parking Authority, which the Agreement required Plaintiff to follow, provided the following:

     3.     Trespass and Loitering are not permitted. Unauthorized presence in the Parking Deck or Lot is not permitted. Persons who engage in any unlawful activity in the Deck or Lot will be prosecuted.

(Doc. # 39-3).

**B.**    **The Birmingham Business Alliance's Complaint and the BPA's First Warning to Plaintiff**

On August 2, 2013, the Birmingham Business Alliance ("BBA") emailed a complaint to the BPA about Plaintiff. (Doc. # 39-4, ¶ 4). According to the BBA complaint, Plaintiff entered the second floor offices of the BBA on several occasions, seeking publicity in magazines published by the BBA. (*Id.*). The complaint further alleged that, while on BBA premises, Plaintiff "exhibited aggressive, rude and threatening behavior. He speaks loudly and in an intimidating way to our receptionist and to others who have tried to communicate with him. He will not leave us alone." (*Id.* at Ex. A). The BBA asked that the BPA tell Plaintiff not to return to the BBA. (*Id.*). The BBA advised that if Plaintiff's behavior continued, it would request assistance from the Birmingham Police Department. (*Id.*).

On August 2, 2013, Defendant Lynn Thomas, the executive director of the BPA, sent a warning letter to Plaintiff advising him of the BBA's complaint. (Doc. # 39-5). Thomas's letter noted that Plaintiff had acted in a similar manner in BPA's office several times ─ demanding to advertise, and that he had been told no. (*Id*.). Thomas further reminded Plaintiff that he had been given permission to wash cars only, and that if this type of behavior continued, the Agreement to provide car wash services would be terminated. (Docs. # 39-5, 39-2).

### C.      Additional Incidents Involving Plaintiff

Tony Blackerby, a cashier supervisor at the BPA, first noticed strange behavior by Plaintiff when Plaintiff placed a sign on the sidewalk advertising that Plaintiff's business was for sale for $25 million. (Doc. # 39-6, ¶ 4). Blackerby also heard Plaintiff speaking loudly and harshly to James Merkerson, the BPA maintenance supervisor. (Doc. # 39-6, ¶ 5). Plaintiff was apparently upset that Merkerson had told him he could not put fliers on the cars in the deck. (*Id*.). After that incident, Blackerby heard Plaintiff say he was going to buy the BPA and everyone would work for him, except for Merkerson, whom he would fire. (Doc. # 39-6, ¶ 6). Plaintiff also placed a sign in front of the BPA office stating that he would pay $1 million to anyone who could inform him of investors to purchase the BPA. (*Id*.).

Another BPA employee, Sonja Mitchell witnessed Plaintiff come to the BPA office on several occasions with a "strong and unprofessional, aggressive attitude." (Doc. # 39-7, ¶ 4). Plaintiff asked to speak to Merkerson, who explained to Plaintiff the rules and regulations for the BPA decks. (*Id*.). This appeared to anger Plaintiff. (*Id*.).

On September 20, 2013, at approximately 6:40 a.m., Judy Butler, a cashier supervisor at the BPA, was in an office and overheard Plaintiff say "when I buy this place the n*** in the back

ain't going to have nothing to say.  The n*** in the back don't know that I talked to the board

president and he's going to meet me here to walk the deck.  I ain't studying Lynn Thomas and

that n*** in the back." (Doc. # 39-8, ¶ 4).  Later that day, at approximately 10:00 a.m., Plaintiff

placed a sign in front of the BPA office offering $1 million for help finding investors to buy the

BPA.  (Doc. # 39-8, ¶ 5).  Plaintiff had a long stick, was waiving it around, and banged on the

door of the BPA.  (Id.).  Butler was concerned because Plaintiff "had been bombarding BPA

employees all morning and cussing, walking around with the big stick." (Doc. # 39-8, ¶ 6).

Other BPA employees asked Plaintiff to leave and called the police.  (Doc. # 39-8, ¶ 6).

The police arrived and spoke with Plaintiff.  (Doc. # 39-8, ¶ 7).  The police later told the

BPA "that they had experienced problems with [Plaintiff] in the past" and that his demeanor

"was escalating." (Id.).  Notably, Plaintiff had been arrested for First Degree Burglary and

Assault and was indicted on May 23, 2013.  (Docs. # 39-12 – 39-14).  Plaintiff also had multiple

prior felony convictions in his past.  (Id.).

The September 20, 2013 incident was also observed by Mitchell, who felt that Plaintiff's

behavior showed that he was becoming "extremely unraveled." (Doc. # 39-7, ¶ 6).  Mitchell

believed that Plaintiff presented a danger to both BPA employees and individuals who parked in

the decks managed by the BPA.  (Id.).

**D.      Removal of Plaintiff's Property by Personnel of the City of Birmingham**

On October 2, 2013, Plaintiff placed signs in front of the BPA office and in front of the

Wells Fargo office building, advertising that Plaintiff was looking for investors to buy the BPA.

(Docs. # 39-9, ¶ 5 and 39-6, ¶ 8).  Matt McCombs, the Special Event Supervisor at the BPA, and

Blackerby observed Jarvis Patton, the Chief Operating Officer for the City of Birmingham,

5

speaking with a downtown patrol officer about the signs.  (Docs. # 39-9, ¶ 4 and 39-6, ¶ 8).

After Patton left, two officers spoke with one of the car wash helpers who worked for Plaintiff.  (Docs. # 39-9, ¶ 5 and 39-6, ¶ 9).  The helper removed the signs.  (*Id.*).  Plaintiff later appeared and returned the signs to the front of the BPA office and the Wells Fargo building. (*Id.*).

After a period of time, Plaintiff and his helper hid the signs in an alley stairwell on BPA property.  (Docs. # 39-9, ¶ 6 and 39-6, ¶ 10).  McCombs then went and moved the signs into the alley and off BPA property. (Doc. # 39-9, ¶ 7).  McCombs was later notified that Plaintiff had placed his signs in a reserved parking area on the basement level, together with carts that Plaintiff used in his business.  (Doc. # 39-9, ¶ 8).

Patton later returned, along with Don Lupo, the Director of the Mayor's Office of Citizens Assistance.  (Doc. # 39-9, ¶ 9).  McCombs spoke with Patton, who told him that they were there to have Plaintiff's signs removed. (*Id.*).  McCombs showed Patton where Plaintiff had stored the signs and carts on BPA property.  (*Id.*).  McCombs, Patton, and Lupo waited on a Public Works truck to arrive, as well as several police officers in case they were needed.  (Doc. # 39-9, ¶ 10).

Patton sent the officers to Wells Fargo to ask if they had a problem with the signs.  (Doc. # 39-9, ¶ 11).  Wells Fargo reported they did not like the signs either.  (*Id.*).  Therefore Patton instructed that all equipment and signs were to be removed from the area.  (*Id.*).

### E.      Termination Letter and Plaintiff's Response

On October 7, 2013, LaVeeda Battle, corporate counsel for the BPA, sent a letter to Jay Smith, an attorney who had previously "helped" Plaintiff concerning the BPA.  (Docs. # 39-10

and 39-11).   The letter stated that the BPA was terminating the Agreement with Plaintiff, effective immediately.  (Doc. # 39-10).   In the letter, Battle reported that complaints had been made about Plaintiff's behavior, Plaintiff had been warned about his behavior, and that Plaintiff had posted false, deceptive and misleading signs seeking regarding a sale of the BPA.   Battle further advised that Plaintiff's signs violated Municipal Ordinance 12-1-1 and demanded that Plaintiff cease and desist his conduct.   (Doc. # 39-10).   Mayor William Bell, city attorney Thomas Bentley, and police chief A.C. Roper were copied on the termination letter.  (Doc. # 39-10).  This termination letter is made the basis of Plaintiff's slander claims.  (Doc. 1-1 ¶29.)

F.      **Plaintiff's Incarceration for Violent Behavior**

On August 14, 2012, Plaintiff was arrested for, and on April 23, 2014, he was convicted of, First Degree Burglary and Assault.  Plaintiff had entered the dwelling of a female with whom he had previously had a relationship and hit and choked her.  (Docs. # 39-12, 39-13, and 39-14). Plaintiff was sentenced to twenty (20) years in prison in light of multiple prior felony convictions.  (Doc. # 39-13).  Plaintiff's criminal conviction in this case has been affirmed by the Alabama Court of Criminal Appeals.  (Doc. # 39-14).  He remains in prison.  (Doc. # 24).

II.     **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or

7

filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the Rule requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *See id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc*. teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial." *Anderson*, 477 U.S. at 252. "Mere allegations" made by a plaintiff are insufficient. *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."

*Sawyer v. Southwest Airlines Co.*, 243 F. Supp.2d 1257, 1262 (D.Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp.2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

In Count One (which appears in both of the Complaints in these cases) Plaintiff alleges that Defendants violated Plaintiff's constitutional rights by (1) removing Plaintiff's car wash supplies and related materials from the decks managed by the BPA without affording Plaintiff due process of law, and (2) breaching Plaintiff's "contract" with the BPA or depriving him of the opportunity to continue his business in the BPA-managed parking decks.  (Case No 2:14-cv-00781-RDP Doc. # 1; Case No 2:14-cv-00866-RDP Doc. # 1).  Count Two of the Complaint in Case No 2:14-cv-00866-RDP also asserts that Defendants slandered Plaintiff.  (Case No 2:14-cv-00866-RDP Doc. # 1).  The court addresses these claims below.

### A.    Plaintiff Did Not Have a Constitutionally Protectable Property Interest to Support his Due Process Claims

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives "any person of life, liberty, or property, without due process of law." U.S. Const.

9

Amend. XIV.  To establish a due process violation, a plaintiff must show that he was deprived of an interest cognizable under the Due Process Clause, and that the procedures attendant upon that deprivation were not constitutionally sufficient. *Kentucky v. Dep't of Corrections v. Thompson*, 490 U.S. 454 (1989); *Board of Regents v. Roth*, 408 U.S. 564, 571 (1972).

The Due Process Clause encompasses two components: a substantive component and a procedural component.  The substantive component of the Due Process Clause protects only "fundamental" rights.  *See McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (citing *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  Fundamental rights "are protected against certain government actions regardless of the fairness of the procedures used to implement them." *McKinney*, 20 F.3d at 1556.  In contrast, "areas in which substantive rights are created only by state law ... are not subject to substantive due process protection ... because substantive due process rights are created only by the Constitution."  *Id*.  Such state law-based rights can be rescinded "so long as the elements of procedural–not substantive–due process are observed."  *Id*. Property interests are created and defined by state law rather than the Constitution. *See Greenbriar Vill., L.L.C. v. Mountain Brook City*, 345 F.3d 1258, 1262 (11th Cir. 2003) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  "[N]on-legislative deprivations of state-created rights ... cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrary [sic] and irrationally." *Greenbriar Vill.,* 345 F.3d at 1263. State created rights are not fundamental rights, and thus are not entitled to substantive due process protection. *See id*. at 1262–63 ("[N]on-legislative deprivations of state-created rights ... cannot support a substantive due process claim."); *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) ("While property interests are protected by

procedural due process even though the interest is derived from state law rather than the Constitution ... substantive due process rights are created only by the Constitution.").

With respect to the procedural component of the Due Process Clause, "no procedural due process claim exists until a sufficiently certain property right under state law is first shown." *Greenbriar Vill*., 345 F.3d at 1265.  Moreover, the Supreme Court has unequivocally held that an unauthorized intentional deprivation of property by a state actor does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

### 1.   Plaintiff Had No Property Right to Maintain Car Wash Supplies and Related Materials in the Parking Decks Managed by the BPA

Plaintiff had no right to maintain his signs and equipment within the BPA decks. Nothing contained in Plaintiff's Agreement with the BPA allowed him to store any equipment within the parking decks managed by the BPA.  (Doc. # 39-1).  Therefore, removal of his equipment from the parking decks did not deprive Plaintiff of any right, and certainly did not involve a  protected property interest sufficient to support a procedural due process claim.  The Agreement merely set forth the terms under which Plaintiff was allowed to operate his business within the BPA decks.

Nor are there any state laws which grant Plaintiff a property interest in either washing cars in the decks managed by the BPA, or in storing materials in the BPA deck.  Indeed, the court is unaware of any decision wherein a court has determined that an individual has a property interest in operating a business or storing materials on property managed by a state actor, such as the BPA.  In *Ford v. Bentley*, 580 Fed. Appx. 701, 711 (11th Cir. 2014), the plaintiffs asserted

claims arising from their alleged property right in owning, operating, and maintaining a bingo business in Macon County, Alabama. *Id*. at 707. The court recognized that the plaintiffs' rights in bingo licenses were "created and defined by state law" and noted that the "uncertainty of the Plaintiffs' right, if any, to operate the games in question at least arguably renders that right unprotectable as a matter of federal procedural due process." *Id*. at 711-712 (citations and punctuation omitted); *see also Kinsey v. City of Opp*, 50 F. Supp. 2d 1232, 1236 (M.D. Ala. 1999)("First, the court notes that Plaintiff fails to cite, and the court has not found, a single case wherein the Supreme Court, any court in the Eleventh Circuit, or any Alabama state court has addressed whether failure to allow [the conduct prohibited in this case] constitutes a constitutional violation. This evidences a finding that no clearly established constitutional right was violated.")

At best, Plaintiff and the BPA had an at-will Agreement which could be terminated at the discretion of either party, including the BPA. This Agreement did not create a protected property interest that entitled Plaintiff to due process. For example, if the BPA had hired Plaintiff as an at-will employee to wash cars in the parking decks, Alabama law is clear that the BPA could have terminated Plaintiff's employment without due process. See *Ex parte Moulton*, 116 So. 3d 1119, 1134 (Ala. 2013) ("Alabama recognizes an employer's right to terminate an at-will employee for any reason…Employment-at-will is not a property interest that requires due process upon termination of the employment."). Thus, Defendants were well within their rights to remove Plaintiff's signs and equipment from their property and terminate his Agreement without due process.

12

To be clear, even though they had the right to do so, Defendants did not remove Plaintiff's materials and terminate his Agreement without warning or due process. Plaintiff was informed that the BPA had received a formal complaint about Plaintiff's behavior and warned that if he continued that type of behavior, his Agreement may be terminated. Moreover, at least as to Plaintiff's signs, he was aware that Defendants did not want them on their property or that of nearby businesses. Not only had he been told to remove them, Defendants had previously removed the signs to property not managed by the BPA.

Therefore, Plaintiff cannot assert here that he had any protectable interest in the Agreement. Nor can he claim that he was not provided any due process with regard to the removal of his signs or the termination of his Agreement. As a matter of law, Plaintiff cannot maintain a Due Process claim.

### 2.     Breach of Plaintiff's "Contract" with the BPA

Plaintiff had no contractual right to continue to operate his business within BPA decks. First, there is a substantial question as to whether the Agreement signed by Plaintiff is even a binding contract. It merely specified the conditions under which Plaintiff would be allowed to offer his services to customers parking in the decks.

"The requisite elements of a contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Hardy Corp. v. Rayco Industrial Inc.*, 143 So.3d 172, 180 (Ala. 2013)(citations and punctuation omitted). The Rule 56 record does not contain substantial evidence indicating that the BPA actually received any consideration (*i.e.*, anything of value) in return for entering into the Agreement. Consideration is an essential element of any contract formation claim. Plaintiff did not pay the BPA for

permission to wash cars in the parking decks and did not share profits from his business with the BPA. Plaintiff was given the right to provide car wash services to existing customers of the BPA, under certain rules and requirements; however, the BPA did not receive any benefit from these services provided by Plaintiff.

But even assuming this was an agreement between the parties, it was at best, an at-will Agreement which the BPA could terminate at its discretion. And despite the at-will nature of the Agreement, Defendants actually gave Plaintiff a warning before terminating the Agreement.

Plaintiff did not have any enforceable contractual rights in maintaining his signs and equipment in BPA's decks, or continuing to offer his services in the decks. Accordingly, his contract claim fails as a matter of law. Defendants are entitled to summary judgment on Plaintiff's due process claims.

### B.      Plaintiff's Slander Claim Fails as a Matter of Law

Plaintiff's slander claim alleges that the Defendants made slanderous allegations against Plaintiff when they copied Mayor Bell, City Attorney Bentley, and Chief Roper on a letter accusing Plaintiff of trying to sell the BPA and of engaging in conduct that violated the conditions under which he was allowed to operate in the BPA decks. (Case No 2:14-cv-00866-RDP Doc. # 1-1, ¶¶29-30).

There are two types of defamation: libel, which involves the use of print media to publish a defamatory comment; and slander, which involves the oral expression of a defamatory comment. *Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386, 390 (Ala. Civ. App. 1999). "To sustain an action for slander, plaintiff must show that the 'alleged defamatory matter was published,' § 6–5–182, Ala.Code 1975, 'by proof of communication of the defamatory matter to

someone other than himself.'" *Nelson v. Lapeyrouse Grain Corp*., 534 So.2d 1085, 1093 (Ala. 1988). Because Plaintiff's slander claim is based on a written communication, his claim is in reality one for defamation, not slander. To prove a communication was defamatory, a plaintiff must present evidence establishing the following elements: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Pub. Co., Inc*., 544 So.2d 875, 877 (Ala.1989) (citing Restatement (2d) of Torts § 558 (1977)).

Importantly, however, "[t]ruth is an absolute defense" to a defamation claim. *Foley v. State Farm Fire and Cas. Ins. Co*., 491 So.2d 934, 937 (Ala.1986) (citation omitted). Whether the statements at issue in a defamation case are reasonably capable of a defamatory meaning is a question of law. *Harris v. School Annual Publ'g Co*., 466 So.2d 963, 964 (Ala. 1985).

### 1.      The Communication was Privileged

Plaintiff's defamation claim is based on the BPA's notification to Bell, Bentley, and Roper that Plaintiff had posted false and misleading signs seeking to sell the BPA. (Case No 2:14-cv-00866-RDP Doc. # 1-1, ¶¶29-30). "A defendant is entitled to the affirmative defense of qualified privilege if she can demonstrate that the communication was 'prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest.'" *Camp v. Correctional Medical Services, Inc.*, 668 F. Supp. 1338, 1363 (M.D. Ala. 2009)(quoting *Ex parte Blue Cross & Blue Shield of Ala.,* 773 So. 2d 475, 478-79 (Ala. 2000)).

15

> Where a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice. The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although in fact he is mistaken.

*Kirby v. Williamson Oil Co*., 510 So. 2d 176 (Ala. 1987) (quoting *Willis v. Demopolis Nursing Home, Inc.*, 336 So.2d 1117, 1120 (Ala.1976) (in turn quoting *Berry v. City of New York Ins. Co.*, 210 Ala. 369, 371, 98 So. 290, 292 (1923))) (punctuation omitted.)

Here, the BPA was created in order to manage off street parking *for the City of Birmingham*. The parking decks and lots managed by the BPA are owned *by the City of Birmingham*. The BPA entered into the Agreement with Plaintiff to allow him to operate his car wash business in parking decks owned by the City and managed by BPA. Upon learning of Plaintiff's violations of the conditions under which he had been allowed to do business in the decks, BPA had a duty to make the City aware that it was terminating Plaintiff's right to conduct his business on City property and the reason for the termination. Therefore, any communication between the BPA and Bell, Bentley, and Roper regarding the operation of the decks is protected by qualified privilege. This includes the communications made the basis of Plaintiff's defamation claim. The communication at issue is not actionable.

### 2. The Communications was Truthful

Additionally. because the statements in the BPA's letter to Bell, Bentley, and Roper were true, Plaintiff's defamation claim fails as a matter of law. Plaintiff disputes Defendants' characterization of his conduct, but he simply cannot dispute (1) his objective conduct or (2) the fact that Defendants received complaints about Plaintiff's conduct. Whether Plaintiff intended

16

his conduct to be aggressive, rude, or threatening is not the issue; that is, his intent does not alter

the fact that Defendants had a good faith belief that Plaintiff acted in an aggressive, rude, and

threatening manner.   Also, the record contains a photograph of the sign which Defendants

reported as Plaintiff seeking to sell the BPA.  That sign states:

> Corporate America Car Wash
> Paying $1 Million Dollars Cash
> Commission to Any Man Or
> Woman Who Can Find Investors
> So Corporate America Car Wash
> System Can Purchase The
> Birmingham Parking Authority.

(Doc. # 39-10 at 7).

### 3.      Plaintiff Suffered No Harm as a Result of the Communication

Finally, "[f]or a communication to be considered defamatory, it must tend to so harm the

reputation of another as to lower him in the estimation of the community or to deter third persons

from associating or dealing with him." *Clark v. America's First Credit Union*, 585 So. 2d 1367,

1370 (Ala. 1991)(citation omitted).  Plaintiff was not harmed by the communications at issue

because BPA had already made the decision to terminate the Agreement.  The communication

merely informed representatives of the City of that decision and the reasons for the decision.

Therefore the record does not support the conclusion that the communication to Bell, Bentley,

and Roper of that decision caused any additional harm.

Moreover, the record contains no evidence that any of the allegedly false statements by

Defendants caused Plaintiff's reputation to have been lowered in the "estimation of the

community" or that third persons were deterred "from associating or dealing with him."  The

court can certainly not say that this communication by Defendants deterred persons from dealing

17

with Plaintiff, particularly in light of the complaints Defendants received about Plaintiff's

conduct.  On this record, Plaintiff has failed to establish that he was damaged by Defendants'

allegedly defamatory communication.

## IV.    Conclusion

For the foregoing reasons, Defendants are entitled to summary judgment on all of the claims

set forth in Plaintiff's Complaints.  A separate order will be entered.

The Clerk of the Court is **DIRECTED** to send a copy of this Order to the following:

> Michael D. Williams, # 133193
> Fountain Correctional Facility
> 3800 Fountain
> Atmore, AL 36503

**DONE** and **ORDERED** this March 4, 2016.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE